UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DALE LEE WRIGHT,                    :
                                    :CIVIL ACTION NO. 3:15-CV-102
          Plaintiff,                :
                                    :(JUDGE CONABOY)
          v.                        :
                                    :
CAROLYN W. COLVIN,                  :
Acting Commissioner of             :
Social Security,                    :
                                    :
          Defendant.                :

---

**MEMORANDUM**

Here we consider Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  (Doc. 1.)  Plaintiff originally alleged disability due to epilepsy, chronic depression, and arthritis.  (R. 160.)  In his application, Plaintiff identified his onset date as March 27, 2007, but he amended the date to January 1, 2013.  (Doc. 11 at 2.)  The Administrative Law Judge ("ALJ") who evaluated the claim concluded that Plaintiff's severe impairments of epilepsy, obstructive sleep apnea, major depressive disorder, carpal tunnel syndrome and degenerative joint disease secondary to osteoarthritis did not alone or in combination meet or equal the listings.  (R. 69.)  The ALJ found that Plaintiff had the residual function capacity ("RFC") for light work with certain nonexertional limitations and that he was capable of performing jobs that existed in significant numbers in the national economy.  (R. 71-77.)  The

ALJ therefore found Plaintiff was not disabled under the Act through December 31, 2013, the date last insured.  (R. 78.)

With this action, Plaintiff asserts that the decision of the Social Security Administration should be reversed and benefits awarded or, alternatively, that the case be remanded for further administrative proceedings.  (Doc. 11 at 23-24.)  He identifies the following errors: 1) the ALJ erred at step three in determining that Plaintiff's major depressive disorder does not meet medical listing 12.04; 2) the Commissioner erred as a matter of law in failing to provide any reason for rejecting the opinion of Stanley E. Schneider, Ed.D.;[1] 3) the Commissioner failed to sustain her burden of establishing there is other work in the national economy Plaintiff could perform; and 4) the ALJ's credibility finding is not based on substantial evidence.  (Doc. 11 at 2.)

After careful consideration of the administrative record and the parties' filings, we conclude Plaintiff's appeal is properly denied.

## I. Background

### A.  Procedural Background

On July 25, 2013, Plaintiff protectively filed an application for DIB.  (R. 67.)  As noted above, Plaintiff alleges disability beginning on January 1, 2013. (Doc. 11 at 2.)  In his application

---

[1] Plaintiff incorrectly identifies Dr. Schneider as a psychiatrist.  (Doc. 11 at 2.)

2

for benefits, Plaintiff claimed his ability to work was limited because of epilepsy, chronic depression, and arthritis.  (R. 160.) The claim was initially denied on December 3, 2013.  (R. 11.) Plaintiff filed a request for a review before an ALJ on January 14, 2014.  (*Id.*)  On May 8, 2014, Plaintiff appeared and testified at a hearing in Harrisburg before ALJ Daniel Myers.  (R. 11-49.) Plaintiff appeared with his attorney, Steven Serra.  (R. 11.) Vocation expert (VE) Michael Kibler also testified.  (*Id.*)  The ALJ issued his unfavorable decision on June 5, 2014, finding that Plaintiff was not disabled under the Social Security Act though December 31, 2013, the date last insured.  (R. 78.)  On August 1, 2014, Plaintiff requested a review with the Appeal's Council.  (R. 9-10.)

The Appeals Council issued its decision on November 12, 2014. (R. 1-8.)  The Appeals Council adopted the ALJ's "statements regarding the pertinent provisions of the Social Security Act, Social Security Administration Regulations, Social Security Rulings and Acquiescence Rulings, the issues in the case, and the evidentiary facts, as applicable."  (R. 5.)  The Appeals Council also adopted the ALJ's "findings or conclusions regarding whether the claimant is 'disabled'.  The Council considered the claimant's statements concerning the subjective complaints (Social Security Ruling 96-7p) and the [sic] adopts the Administrative Law Judge's conclusions in that regard."  (*Id.*)  The Council agreed with the

ALJ's findings under steps one through five of the sequential evaluation, but did not agree that the claimant's date last insured was December 31, 2013.  (R. 5.)  Rather, the Appeals Council determined that Plaintiff met the insured status requirements through December 31, 2016.  (*Id.*)  The Appeals Council then determined that the remainder of the ALJ's findings applied through June 5, 2014 (the date of the ALJ decision) since the record did not indicate any significant change in Plaintiff's impairments from January 1, 2013, to June 5, 2014.  (*Id.*)  Accordingly, the Appeals Council concluded "the claimant has not been under a 'disability,' as defined in the Social Security Act, at any time from January 1, 2013, the alleged onset date, through June 5, 2014, the date of the Administrative Law Judge's decision.  (R. 5.)

On January 16, 2015, Plaintiff filed his action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on March 27, 2015.  (Docs. 9, 10.)  Plaintiff filed his supporting brief on May 11, 2015.  (Doc. 11.)  Defendant filed her opposition brief on June 11, 2015 (Doc. 12), and Plaintiff filed his reply brief on June 30, 2015 (Doc. 15).  Therefore, this matter is fully briefed and ripe for disposition.

**B.   *Factual Background***

Plaintiff was born on October 3, 1962.  (R. 77.)  Plaintiff has a at least a high school education.  (*Id.*)  In the August 14,

2013, Disability Report, he reported that he stopped working on December 7, 2012, because his temporary contract position ended. (R. 160.)  He also indicated in the report that he believed his conditions became severe enough to keep him from working on August 6, 2007.  (*Id.*)  The report indicates Plaintiff had worked as an administrative assistant, call center customer care specialist, customer service counselor, customer service representative, and group administrator sales support.  (R. 162.)

Regarding Plaintiff's background, Defendant notes that Plaintiff held several long-term jobs, reported he received several promotions in customer service, and recently completed a medical coding/billing certification with honors.  (Doc. 12 at 6 (citing R. 17, 249, 299).)  Defendant also notes that Plaintiff received unemployment benefits after being laid off in 2009, exhausted those benefits and submitted a previous application for DIB which was denied without appeal.  (*Id.* (citing R. 51, 54, 126, 157, 327).) Defendant adds that the application under consideration here was filed when a temporary employment position ended.  (*Id.* (citing R. 126, 156, 298).)

1.   **Impairment Evidence**

We review evidence related to the impairments alleged by Plaintiff and discussed by the ALJ, focusing on evidence pertinent to the relevant time period--Plaintiff's alleged onset date of January 1, 2013, through June 5, 2014, the date of the ALJ's

decision.

**a.    Physical Impairment Evidence**

On October 20, 2013, Plaintiff underwent a consultative examination by Thomas McLaughlin, M.D.  (R. 278-94.)  Dr. McLaughlin noted that Plaintiff presented for a disability evaluation with allegations of epilepsy, obstructive sleep apnea, degenerative joint disease and carpal tunnel syndrome.  (R. 278.) Dr. McLaughlin recorded the following history:

>           The claimant has a history of epilepsy
> diagnosed at the age of nineteen.  His last
> seizure was in April 2013.  He generally has
> three to four seizures per year and usually
> has an aura before the seizures.  When he has
> a seizure he has tonic clonic movements of
> the extremities as well as tongue biting, lip
> biting and incontinence of urine but no
> incontinence of bowel.  The claimant is
> better controlled on medications of carbitol.
> His last ER visit for epilepsy was in May of
> 2012.  He does not drive.
>
>           He also has a history of obstructive
> sleep apnea.  He had used CPAP in the past
> which helped however he is lacking insurance
> and is not using any intervention at this
> time for the obstructive sleep apnea.
>
>           He also has complaints consistent with
> degenerative joint disease involving the
> fingers, the knees, the back and the neck.
> He has no radicular symptoms.  He has
> intermittent achy pain in various joints
> without swelling, stiffness, locking up or
> giving way.  He is on no medications for
> this.
>
>           He also has a history of bilateral
> carpal tunnel syndrome with pain in his
> fingers and paresthesia as well as his hands
> "locking up".  He has not had surgery and has

not had EMG evaluation.

(R. 278-79.)

Surgically, Plaintiff had a laparoscopic cholecystectomy in 2013, and a frontal lobectomy for congenital brain cyst in May of 2007.  (R. 279.)  The Review of Systems was unremarkable except as recorded in the history of present illnesses.  (R. 280.)

On physical examination, Plaintiff appeared of normal nutritional status, he had a normal gait, was able to change positions without difficulty, appeared comfortable, had good understanding and knowledge, and was cooperative.  (R. 280.) No problems were noted on examination of the head, neck, chest, cardiac, abdomen and extremities.  (R. 281.)  Musculoskeletal examination showed the following: no tenderness over the cervical spine; shoulders, elbows and wrists were nontender with no redness, swelling, warmth or nodules; examination of the hands revealed no tenderness, redness, warmth, swelling, nodules, or atrophy, Tinel's and Phalen's were positive bilaterally, and Plaintiff was able to make a fist bilaterally, open a jar, open a door, pick up coins, write, and use the hands to button and unbutton without problem; examination of the knees and hips revealed no tenderness or other problems; examination of the dorsolumbar spine revealed no problems, including no evidence of muscle weakness or atrophy.  (R. 281-82.)

Neurologically, Plaintiff's mental status was alert and

7

oriented and his affect appropriate.  (R. 282.)  Plaintiff could walk on his heels and toes, walk heel-to-toe and squat without difficulty.  (*Id.*)  Dr. McLaughlin noted no irregularities with his neurologic examination.  (*Id.*)

After his examination and review of Pinnacle Family Health records from 2001 and a Friends Hospital Discharge Summary from 2012, Dr. McLaughlin assessed Plaintiff to have epilepsy, obstructive sleep apnea, degenerative joint disease secondary to osteoarthritis, carpal tunnel syndrome bilaterally, and tobacco abuse.  (R. 282-83.)  Dr. McLaughlin also completed a Medical Source Statement to Do Work Related Activities (Physical) (R. 289-94) which will be reviewed below in the Opinion Evidence section of this Memorandum.

On February 19, 2014, Plaintiff saw neurologist Jayant Acharya, M.D., at Milton S. Hershey Medical Center.  (R. 343.)  Dr. Acharya had last seen Plaintiff in 2010.  (*Id.*)  Dr. Acharya reported that Plaintiff had developed seizures in 1998, was diagnosed with right frontal lobe epilepsy, had a frontal lobectomy in March 2007, and was seizure free (although he continued to have auras) until 2008 when he developed nocturnal seizures.  (*Id.*)  Dr. Acharya noted that Plaintiff was directed to start Zonegran when he was seen in 2010 but Plaintiff only took the drug for a month reportedly because it was too expensive.  (*Id.*)  Plaintiff had been seizure free from May 2012 (with occasional auras) until April

8

2013. (*Id.*) Plaintiff told Dr. Acharya that the auras, which had occurred twice in the preceding ten months, consisted of right arm tingling for a few minutes to one hour and he is disoriented for a few minutes. (*Id.*) He also reported that he had a petit seizure in April 2013 which consisted of mild shaking in his sleep and one grand mal seizure over the preceding year (January 2014) which he associated with colonoscopy preparation. (*Id.*) On physical examination, Plaintiff appeared well-built, well-nourished, and well groomed, he was alert and oriented to time, place and person, his attention span and concentration were normal, his immediate recall and recent and remote memory were normal, and all other aspects of his examination were normal. (R. 344-45.) Dr. Acharya's impression was that Plaintiff had partial epilepsy, temporal versus frontal origin, and that he was likely symptomatic due to a frontal cyst diagnosed before the frontal lobectomy. (R. 346.) Dr. Acharya noted that further work-up was needed. (*Id.*) He advised Plaintiff about seizure precautions, including avoiding significant heights, heavy machinery, swimming alone and that showers are preferable to tub bathing. (*Id.*)

**b.   Mental Impairment Evidence**

Plaintiff was voluntarily admitted to Friends Hospital in Philadelphia, Pennsylvania, on September 4, 2012. (R. 266.) He was discharged on September 13, 2012. (*Id.*) The Discharge Summary indicates that Plaintiff

presented with chief complaints of agitation and depression.  He reported two months of worsening depression after loss of his job, breakup with partner, family conflict, financial problems, and homelessness for the last two weeks.  He had severe depression with hypersomnolence, poor appetite, low energy, poor concentration, and thoughts of being a "failure."  He said that he had suicidal ideation with a plan to overdose on Trazadone.  He had homicidal ideation toward his sister when she was verbally abusive to him or to her partner in front of him.  The patient attributed his homelessness to having to leave the abusive environment in his sister's home.

Past Psychiatric History: The patient was diagnosed with depression for the first time at the age of 23.  He attended psychotherapy for four years.  His primary care doctor had prescribed multiple antidepressant medications.  He was also treated for epilepsy.  He denied a history of suicide attempts.  He had no unmanageability or loss of control due to mood-altering chemicals, and his drug urine screen was negative.

(R. 266.)  The Discharge Summary noted that Plaintiff "gradually began to improve in the therapeutic milieu. . . . He tolerated the medication well, and at discharge, he was behaviorally stable for stepdown and opted for a recovery house environment."  (*Id.*) At discharge, Plaintiff was alert and oriented, and his insight and judgment were improved.  (R. 267.)  He was diagnosed with major depressive disorder with a GAF on admission of 25 and on discharge 59.  (*Id.*)  Plaintiff's prognosis was reported to be good, and he was referred to Montgomery Mental Health, in Norristown, Pennsylvania.  (*Id.*)

10

On November 13, 2013, Stanley E. Schneider, Ed.D., conducted a Clinical Psychological Disability Evaluation.  (R. 297.)  Dr. Schneider noted that Plaintiff reported he was applying for disability after he applied in 2010 and had been denied.  (R. 298.)  When asked if he could do any kind of work, Plaintiff said he would like to.  (*Id.*)  When asked about his alleged chronic depression, Plaintiff reported that

> he goes through periods when he feels okay
> and then something happens . . . "nothing is
> right . . . I will ruminate up to the point
> where I can't function . . . I feel lost,
> sad, hopeless.  I sleep a lot . . . I look
> for work, I go on the internet and apply and
> I keep getting rejection notices . . . I had
> been in and out of treatment since I was 23
> years old . . . I am 51 and I am going no
> where."

(R. 299.)  Plaintiff reported to Dr. Schneider that he had daily crying spells, felt guilty, worthless and had a sense of helplessness and hopelessness regarding his future.  (*Id.*)   He also reported that he had worked at Highmark in customer service for nine years and left there in 2009.  (R. 299-300.)  He had been fired three times in the preceding five years from various customer service jobs either because of his employer's claimed inefficiency for spending too much time addressing customers' concerns or being arrogant.  (R. 300.)  Plaintiff reported that he got along well with coworkers but had a problem relating to authority figures and supervisors unless he could control them.  (*Id.*)  At the time of the evaluation, Plaintiff was living with his ex-partner who

11

supported him, and he was also receiving food stamps and medical assistance.  (*Id.*)  Plaintiff said he had received unemployment benefits until July 2013.  (*Id.*)

Regarding Plaintiff's ability to interact, Dr. Schneider noted that Plaintiff had a lot of underlying anger, and his irritability was "tapped into quite readily" which Dr. Schneider thought may have been related to his "frustration and sense of failing and feeling lost."  (*Id.*)  Dr. Schneider stated that there was no memory impairment at all and no evidence of any perceptual disturbances.  (*Id.*)

Plaintiff described his mood as sad and occasionally suicidal when he was left home alone.  (*Id.*)  Dr. Schneider found Plaintiff's affect to be appropriate to his mood which reflected "somewhat of an agitated depression."  (*Id.*)  Dr. Schneider noted that cognitively Plaintiff was a bright man, his attention and concentration were adequate, there was no evidence of an impulse control problem, and test judgment and insight were good.  (R. 301.)  He further noted that Plaintiff had no reported or identified impairments, restrictions or limitations in his activities of daily living, his concentration was fine, his persistence varied depending on his mood, and Plaintiff identified his pace as slow.  (R. 302.)

Dr. Schneider diagnosed "[m]ajor depressive disorder, recurrent, without psychotic features."  (R. 301.)  He concluded

12

that Plaintiff's prognosis was poor emotionally.  (R. 302.)  Dr. Schneider completed a Medical Source Statement to Do Work Related Activities (Mental) (R. 303-05) which will be reviewed below in the Opinion Evidence section of this Memorandum.

Plaintiff sought treatment at Riverside Associates in Harrisburg, Pennsylvania, from January 14, 2014, through April 29, 2014.  (R. 320.)  The records from this provider consist of session dates (R. 315, 320) and two Treatment Plan & Service Recommendations authored by Hilary Spease, a licensed clinical social worker, which were approved and reviewed by Wayne D. Schmoyer, Ed.D. (R. 316-19, 322-24).  The session schedules show that Plaintiff had twenty-four sessions during this time period. (R. 315, 320.)  The first Treatment Plan & Service Recommendations is dated February 12, 2014.  (R. 321.)  Plaintiff's problems were identified as depression, anxiety, relationship issues, and employment.  (*Id.*)  Relative to employment, Plaintiff reported that he had problems with his memory which Ms. Spease encouraged him to talk about with his neurologist.  (*Id.*)  He was not taking any psychotropic medications at the time.  (R. 322.)  The following goals were established:  stabilization of mood; decrease overall anxiety level and increase coping skills; improve interpersonal relationship skills; and regarding employment, increase independence.  (R. 323.)  Under the goal of increasing independence, Ms. Spease noted that Plaintiff would talk to his

13

neurologist about his ability to work, and, based on the recommendation of the neurologist, Plaintiff would either apply for a job or apply for disability. (*Id.*)  On March 31, 2014, Ms. Spease noted that Plaintiff's problems previously identified remained: regarding depression, he had a psychiatric evaluation the previous week and started on an antidepressant; regarding anxiety, Plaintiff reported he had ben worrying about finances; regarding relationship issues, Plaintiff reported regression with his partner's drinking issues; and regarding employment, Plaintiff said he was waiting for a Social Security hearing. (R. 316-17.)  The March 31st Plan also indicates that Ms. Spease again encouraged Plaintiff to talk about his reported memory problems with his neurologist. (*Id.*)  Goals were similar to those established in February, including the employment-related goal of Plaintiff talking with his neurologist about his ability to work. (R. 317-18.)

2.   **Opinion Evidence**

Dr. McLaughlin completed a Medical Source Statement of Ability to Do Work Related Activities (Physical) on November 4, 2013--the date of his physical examination of Plaintiff. (R. 289-94.)  He identified the following abilities and limitations: Plaintiff could continuously lift and carry up to twenty pounds, frequently lift up to fifty pounds, and occasionally lift up to one hundred pounds; in an eight-hour workday Plaintiff could sit for eight hours, stand

14

for four hours, and walk for four hours without interruption;
totals in an eight-hour day were sit for eight hours and stand and
walk for six hours; Plaintiff's use of his hands was limited only
to the extent he could frequently (rather than continuously) use
his right and left hand for fingering; and Plaintiff could
continuously operate foot controls; Plaintiff could never climb
ladders or scaffolds and could frequently climb stairs and ramps,
balance, stoop, kneel, crouch, and crawl.  (R. 289-92.)  In the
"Environmental Limitations" category, Dr. McLaughlin opined that
Plaintiff should never be exposed to unprotected heights or operate
a motor vehicle, he can occasionally be exposed to dust, odors,
fumes and pulmonary irritants, and he can frequently be around
moving mechanical parts, and be exposed to humidity and wetness,
extreme cold, extreme heat, and vibrations.  (R. 293.)

Dr. Schneider completed a Medical Source Statement of Ability
to Do Work Related Activities (Mental) on November 13, 2013--the
date of his evaluation of Plaintiff.  (R. 303-05.)  He opined that
Plaintiff's ability to understand, remember, and carry out
instructions was limited by his mental impairment to the extent he
had moderate restrictions in his abilities to understand and
remember complex instructions, carry out complex instructions, and
make judgments on complex work-related decisions.  (R. 303.)
Plaintiff had no limitations related to simple instructions and
decisions.  (*Id.*)  Dr. Schneider concluded that Plaintiff's ability

15

to interact appropriately with supervisors, co-workers, and the
public, as well as respond to changes in the routine work setting
was affected by his impairment in that he had a marked restriction
in his ability to interact appropriately with supervisors.  (R.
304.)  Dr. Schneider found no problems in the areas of interacting
appropriately with the public and with coworkers; he did not check
any box in the category of "responding appropriately to usual work
situations and to changes in a routine setting" though he noted in
the comment section that Plaintiff "does not handle change well.
[']I get fearful of change unless it's my idea.[']"

In the December 2, 2013, Disability Determination Explanation,
Thomas Fink, Ph.D., indicated that he reviewed records including
the opinions of Dr. McLaughlin and Dr. Schneider.  (R. 51-54.)  He
concluded that Plaintiff had the medically determinable impairments
of epilepsy, affective disorders, and personality disorders.  (R.
55.)  Under the "A" criteria of the listings--12.04 for Affective
Disorders and 12.08 for Personality Disorders--he found the
impairments did not precisely satisfy the diagnostic criteria.
(*Id.*)  Under the "B" criteria of the listings, Dr. Fink opined that
Plaintiff had mild restriction of activities of daily living,
moderate difficulties in maintaining social functioning and
maintaining concentration, persistence or pace, and he had no
repeated episodes of decompensation.  (*Id.*)  Dr. Fink also
concluded that the evidence did not establish the "C" criteria of

the listings.  (*Id.*)  He opined that Plaintiff's report of the
limiting effects of his symptoms were partially credible based on
his consideration of Plaintiff's activities of daily living,
medication treatment, and treatment other than medication.  (R.
56.)  In his Residual Functional Capacity assessment, Dr. Fink
opined that Plaintiff's only physical limitation was an
environmental limitation--he should avoid concentrated exposure to
hazards such as machinery and heights.  (R. 57.)  In his mental
RFC, Dr. Fink opined that Plaintiff was moderately limited in his
abilities to carry out detailed instructions, maintain
concentration for extended periods, and interact appropriately with
the general public.  (R. 58-59.)  Dr. Fink noted that Plaintiff was
not involved in mental health treatment at the time.  (R. 59.)  He
concluded that Plaintiff was able to meet the basic demands of
simple routine work on a sustained basis despite the limitations
resulting from his impairment.  (*Id.*)

3.  **Hearing Testimony**

    Plaintiff, represented by Attorney Steven Serra, testified at
the hearing held on May 8, 2014, before ALJ Daniel Myers.  (R. 11-
49.)  Vocational Expert ("VE") Michael Kibler also testified.  (R.
11.)  It was at this hearing that Plaintiff's attorney amended
Plaintiff's onset date to January 1, 2013.  (R. 15.)

    Plaintiff was fifty-one years old at the time of the hearing.
(R. 16.)  He testified that he had problems with his short term

17

memory which affected his ability to work in the customer service field where he had previously been employed. (R. 18.) When asked by the ALJ what prevented him from working an unskilled job for forty hours a week, eight hours a day, Plaintiff responded that the biggest obstacle would be that the medications he was taking for depression and epilepsy made him extremely tired and lethargic. (R. 19.)

The ALJ also asked Plaintiff if he had a problem with supervisors, and Plaintiff responded that occasionally he did. (R. 42.) He explained that he compared his more recent jobs with his Highmark position and had a problem because what more recent employers called customer service was more like being a telephone operator: rather than resolving issues as he had done at Highmark, he was just supposed to get the caller off the phone whether he resolved the issue or not. (*Id.*) Plaintiff said he complained to his supervisors about this but they just said Highmark expected too much. (R. 42-43.)

Regarding mental health treatment, Plaintiff stated that he had just restarted at Riverside Associates and had gone there previously, the last time being in 2010. (R. 19.) He also clarified that he had just started taking medication for his depression in March 2014 and had taken medication during his stay at Friends Hospital in 2012. (R. 20.) When questioned about why he stopped taking medication in 2012, Plaintiff responded that he

could not afford it.  (*Id.*)

Plaintiff testified that he last had a seizure on January 24, 2014, when he awoke from sleep at 3:00 a.m. realizing he had just had a grand mal seizure.  (R. 21.)  At that time he had not had a grand mal seizure in over a year.  (*Id.*)  He further testified that his recovery period for this type of seizure was twenty-four hours during which he was unable to do anything other than sleep.  (R. 22.)  He also testified that he sleeps for about twelve hours after this type of seizure.  (*Id.*)  Plaintiff said that since the start of the year he had petit mal seizures about once every month and a half and they always occurred at night, adding that he had no seizures in 2013.  (R. 30-31.)

When asked about his ability to function at home alone, Plaintiff testified that he has a hard time focusing on chores such as vacuuming, dusting, cleaning the kitchen, doing dishes, and preparing dinner in that he starts one project and goes to another before completing the first.  (R. 23.)  Plaintiff also said that he does grocery shopping, either alone or with his partner and when he goes alone he walks to local stores.  (R. 23-24.)  He reported that he does the laundry with his partner at a laundromat.  (R. 24.)  He also testified that he takes naps during the day, usually about 11:00 in the morning for two to three hours.  (R. 28.)  Regarding sleeping at night, Plaintiff said he goes to sleep at night but wakes up more tired in the morning either because of sleep apnea,

19

the medications he's taking, or his depression.  (R. 28.)

Plaintiff said his depression related symptoms included one or two days a week where he does not get out of bed and three to five days a week where he does not leave the house because he sees no purpose in doing so.  (R. 29.)  He also said he has a very low energy level and has suicidal thoughts two to three times a month. (*Id.*)  Plaintiff stated that people in his life told him his mental status was improving and he was glad he went back to therapy but he didn't feel happy or depressed, he just felt empty.  (R. 29-30.) He had this feeling for about three weeks--since taking the medication--and overall assessed the medications to be helping somewhat.  (R. 30.)

Plaintiff explained that after nine years employment he was terminated from his position in customer service at Highmark because of low production statistics--after his March 2007 right frontal lobectomy he found that he could not keep up the pace when he went back to work.  (R. 26.)

Regarding carpal tunnel syndrome, Plaintiff first testified that it affected his fingers, hands, and knees.  (R. 32.)  Upon further questioning, Plaintiff clarified that it was just his hands and fingers which resulted in difficulty handling and grasping things, opening jars.  (*Id.*)

Plaintiff said he had difficulty walking up and down stairs because of knee problems and his knees lock up about two or three

times a month and occasionally he falls because of it.  (R. 32-33.)
He reported he had fallen three weeks earlier when he was in
physical therapy.  (R. 33.)  When the ALJ asked more about this,
Plaintiff stated that he had gone to physical therapy for four
weeks at the direction of his podiatrist, Dr. Grossman, and his
primary care physician at Klein Health Center, Dr. Cheriyath, had
made the referral.[2]  (*Id.*)  Plaintiff identified the problem with
his foot as plantar fasciitis which causes pain in the arch of his
foot which affects his daily activities at times (estimated to be
"[a] couple times a day" because he is unable to walk).  (R. 34-
35.)  Plaintiff's attorney asked him how far he could walk before
either his knees or his foot caused him to stop and rest, and
Plaintiff responded "[u]sually a couple of feet."  (R. 35.)
Plaintiff said he was unable to walk a city block.  (R. 35.)

     When his attorney asked if he had problems sitting, Plaintiff
said that he did because the plantar fasciitis is the worst if he
sits too long or if he is asleep in that the muscles tense up and
he is then unable to walk.  (R. 35-36.)  Plaintiff added that this
occurs after he sits for fifteen to twenty minutes and he addresses
it by getting up and stretching for ten to fifteen minutes.  (R.
36.)

---

[2]  The ALJ then asked why there were no records from Klein or
Dr. Grossman and Plaintiff's attorney said they had recently been
requested and had not been received but he did not know why they
had not been requested sooner.  (R. 33-34.)  It does not appear
that records from these providers are part of the record.

Plaintiff said he likes to read, garden, play with his cat and watch television.  (R. 37.)  Plaintiff stated that he has friends, one of whom is a neighbor who comes for coffee in the morning and then wants to go out and likes company so he goes with her.  (*Id.*) He also said that he goes out with his partner and friends, including to music and art festivals.  (R. 38.)  Plaintiff testified that he is on the computer daily and pays the bills at the direction of his partner.  (R. 39-40.)

The Vocational Expert then testified, first describing Plaintiff's past work and then answering the ALJ's hypothetical questions.  (R. 41.)  In response to a hypothetical question which limited the individual to only occasional interactions with members of the public, coworkers and supervisors, the VE responded that such an individual could not work in any of the jobs Plaintiff had performed in the past.  (R. 43.)  He further testified that the person could perform other jobs in the economy.  (*Id.*)  In one hypothetical, the ALJ explained the individual as follows:

> This hypothetical individual is limited to occupations in the light category; must avoid hazards, such as unprotected heights and non-stationary machinery that moves about on the jobsite floor, such as forklifts; no motor vehicles.  Can understand, remember, carry out simple instructions of up to three-step commands exercising only simple judgments; only occasional changes to the routine work setting; only occasional interactions with members of the public, coworkers, and with supervisors.

(R. 45.)  The VE stated that the jobs of bakery racker and bindery-

22

machine feeder-off bearer would be available to such an individual. (R. 44, 45.)  When the ALJ added that the individual described above was also limited to occasional handling, fingering, and feeling, and occasional bending, stooping, kneeling, crouching, crawling, and stairs, the VE said such an individual could, by way of example, perform the job of bakery line worker.  (R. 45-46.) The ALJ asked the VE if there was any conflict between the information the VE provided and the DOT and the VE responded that there was not.  (R. 47.)

Plaintiff's attorney then asked whether the individual would be able to perform these jobs if he would be off task more than fifteen percent of the workday.  (R. 46-47.)  The VE said he would not.  (R. 47.)  He also said if the individual was absent more than two days per month as a result of his impairments on an ongoing basis he would not be able to sustain any gainful activity.  (*Id.*)

**4.   ALJ Decision**

By decision of June 5, 2014, ALJ Myers determined that Plaintiff was not disabled as defined in the Social Security Act. (R.79.)  He made the following findings of fact and conclusions of law:

> 1.   The claimant last met the insured status requirements of the Social Security Act on December 31, 2013.
>
> 2.   The claimant did not engage in substantial gainful activity during the period from his alleged onset date of January 1, 2013 through his date last

insured of December 31, 2013 (20 CFR 404.1571 et seq.).

3.  Through the date last insured, the claimant had the following severe impairments: epilepsy, obstructive sleep apnea, major depressive disorder, carpal tunnel syndrome and degenerative joint disease secondary to osteoarthritis (20 CR 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) subject to the following limitations: must avoid hazards, such as unprotected heights and nonstationary machinery moving about on the job site floor, such as forklifts; no operation of motor vehicles; can understand, remember and carry out simple instructions involving up to 3 step commands; limited to exercising only simple work-related judgments; limited to occupations involving only occasional changes to the routine work setting; limited to occasional interactions with members of the public, coworkers and supervisors; occasional handling, fingering and feeling; and occasional bending, stooping, kneeling, crouching, crawling and climbing stairs.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on October 3, 1962 and was 51 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.   The claimant was not under a disability, as defined in the Social Security Act, at any time from January 1, 2013, the alleged onset date, through December 31, 2013, the date last insured (20 CFR 404.1520(g)).

(R. 69-78.)  The ALJ reviewed the impairments noted in the record

and explained how he determined that Plaintiff had the severe

impairments noted above.  (R. 69-71.)  He determined that

Plaintiff's impairments did not meet or equal the criteria of

listing 12.04 after considering evidence of record regarding

Plaintiff's limitations in the context the "paragraph B" and

"paragraph C" requirements.  (R. 70-71.)

In explaining Plaintiff's RFC, the ALJ reviewed the objective and opinion evidence and set out his rationale for the weight given to Plaintiff's subjective complaints and opinions contained in the record.  (R. 72-77.)

The ALJ gave great weight to the opinions of examining source Dr. McLaughlin because he found that his opinions were substantiated by clinical evidence and the conservative level of treatment Plaintiff received.  (R. 76.)  He gave limited weight to Dr. Schneider's opinions because he concluded they appeared to be based primarily on Plaintiff's subjective reporting.  (R. 76.)

The ALJ found Plaintiff not entirely credible, reviewing his reasons for doing so in detail and considering evidence related to each of Plaintiff's claimed impairments.  (R. 72-76.)

Consistent with the testimony of the VE, the ALJ found Plaintiff could not perform his past relevant work.  (R. 77.)  With the assistance of the VE, the ALJ concluded that Plaintiff was able to perform other jobs which exist in the national economy.  (R 77-78.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[3]  It is necessary for the

---

[3]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

26

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e).

---

result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found that Plaintiff was capable of performing work that existed in significant numbers in the national economy.  (R. 77.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a
> talismanic or self-executing formula for
> adjudication; rather, our decisions make
> clear that determination of the existence *vel
> non* of substantial evidence is *not* merely a
> quantitative exercise.  A single piece of
> evidence will not satisfy the substantiality
> test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it
> is overwhelmed by other evidence--
> particularly certain types of evidence (e.g.,
> that offered by treating physicians)--or if
> it really constitutes not evidence but mere
> conclusion.  *See* [*Cotter*, 642 F.2d] at 706
> ("'Substantial evidence' can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to
analyze all evidence.  If she has not done so and has not
sufficiently explained the weight given to all probative exhibits,
"to say that [the] decision is supported by substantial evidence
approaches an abdication of the court's duty to scrutinize the
record as a whole to determine whether the conclusions reached are
rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.
1979).  In *Cotter*, the Circuit Court clarified that the ALJ must
not only state the evidence considered which supports the result
but also indicate what evidence was rejected: "Since it is apparent
that the ALJ cannot reject evidence for no reason or the wrong

29

reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."  *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented."  *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d

30

Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See, e.g., Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).  It is the ALJ's responsibility to explicitly provide reasons for his decision and analysis later provided by the defendant cannot make up for analysis lacking in the ALJ's decision.  *Fargnoli v. Massanari*, 247 F.3d 34, 42, 44 n.7 (3d Cir. 2001); *Dobrowolsky*, 606 F.2d at 406-07.  Neither the reviewing court nor the defendant "may create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself."  *Hague v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007); *see also Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 50 (1983) (citations omitted) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.")

## IV. Discussion

### A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406.  Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.*  "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974).  As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406.  Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

### B. Plaintiff's Alleged Errors

As set out above, Plaintiff asserts the decision of the Social Security Administration is error for the following reasons: 1) the

32

ALJ erred at step three in determining that Plaintiff's major depressive disorder does not meet medical listing 12.04; 2) the Commissioner erred as a matter of law in failing to provide any reason for rejecting the opinion of Stanley E. Schneider, Ed.D.; 3) the Commissioner failed to sustain her burden of establishing there is other work in the national economy Plaintiff could perform; and 4) the ALJ's credibility finding is not based on substantial evidence.  (Doc. 11 at 2.)

**1.   Listing 12.04**

Plaintiff first asserts that the ALJ erred when he did not find that Plaintiff's major depressive disorder met the requirements of listing 12.04.  (Doc. 11 at 10.)  Defendant argues that the ALJ appropriately found that Plaintiff's condition failed to meet the requirements of Listing 12.04.  (Doc. 12 at 14-20)  We agree with Defendant.

A claimant bears the burden of establishing that his impairment meets or equals a listed impairment.  *Poulos v. Comm'r of Social Security*, 474 F.3d 88, 92 (3d Cir. 2007).  In general the required level of severity for an affective disorder may be established when the criteria for both parts A and B are met or when the criteria in paragraph C are satisfied.  20 C.F.R. pt. 404, subpt. P, App. 1 § 12.04.  The part A criteria "are medical findings that substantiate the presence of the mental disorder." *Cunningham v. Comm'r of Social Security*, 507 F. App'x 111, 116 n.4

33

(3d Cir. 2012) (citing 20 C.F.R. pt. 404, subpt. P, App. 1, §
1200(A)).  To satisfy the "B" criteria of Listing 12.04, the mental
impairments must satisfy at least two of the following: 1) marked
restriction of activities of daily living; 2) marked difficulties
in maintaining social functioning; 3) marked difficulties in
maintaining concentration, persistence, or pace; 4) repeated
episodes of decompensation, each of extended duration.  20 C.F.R.
pt. 404, subpt. P, App. 1 § 12.04(B).  "A 'marked' restriction or
difficulty is one that is more than moderate but less than extreme
and that 'interfere[s] seriously with [the] ability to function
independently, appropriately, effectively, and on a sustained
basis.'"  *Cunningham*, 507 F. App'x at 116 (citing 20 C.F.R. pt.
404, subpt. P, App. 1, § 12.00(C)).  Paragraph C of listing 12.04
requires demonstration of one of the following: 1) repeated and
extended episodes of decompensation; 2) a residual disease process
that has resulted in such marginal adjustment that even a minimal
increase in mental demands or change in the environment would be
predicted to cause the individual to decompensate; or 3) current
history of one or more years' inability to function outside a
highly supportive living arrangement, with an indication of a
continued need for such an arrangement.  20 C.F.R. pt. 404, subpt.
P, App. 1 § 12.04(C).

    The ALJ considered both the B and C criteria.  (R. 70-71.)
Under paragraph B, he reviewed all requirements and found that

Plaintiff did not meet any of them. (*Id.*) He found that Plaintiff had mild restrictions in his activities of daily living--though he complained of tiredness and a lack of motivation, he was employed. (R. 14.) In social functioning, the ALJ found that Plaintiff had mild difficulties--though he complained of sleep disturbance and intermittent low motivation to perform daily tasks, the ALJ found the record suggested Plaintiff was able to perform a wide range of activities of daily living and there was little evidence that he is limited due to psychiatric symptoms. (R. 70.) The ALJ concluded Plaintiff had moderate difficulties in social functioning based in part on relationship issues and difficulty getting along with authority figures and supervisors but he also spends time with others, is not prevented from leaving the house because of depression or anxiety, and there is no evidence of social withdrawal or antisocial behaviors. (R. 71.) The ALJ concluded Plaintiff had moderate difficulties in concentration, persistence, or pace--though the record showed a history of emotional difficulties, he showed intact attention, concentration and memory on examination. (R. 71.) The ALJ determined that Plaintiff had experienced no episodes of decompensation. (*Id.*)

ALJ Myers also concluded that Plaintiff had failed to establish the presence of the paragraph C criteria. (*Id.*) He noted that he found no support in the record for the existence of any of the criteria. (*Id.*)

35

Plaintiff has failed to meet his burden on this issue in that he catalogs evidence of record but does not show how the evidence satisfies the specific listing requirements.  (Doc. 11 at 10-13.) Conclusory assertions are not enough.

Plaintiff argues in his reply brief that he meets the requirements of paragraph B because he has a marked impairment in social functioning and a marked impairment in maintaining concentration, persistence or pace.  (Doc. 15 at 2-3.)  He again cites anecdotal observations from hospitalization and examining source records and incidents of self-reporting.  As discussed above, these references do not show that the ALJ erred at step three--Plaintiff has not provided evidence which would undermine the ALJ's conclusion that Plaintiff's mental impairment does not meet the requirements of listing 12.04.

## 2. **Opinion of Stanley E. Schneider, Ed.D.**

Plaintiff next claims the Commissioner erred as a matter of law in failing to provide any reason for rejecting Dr. Schneider's opinion.  We disagree.

First, the ALJ did not reject Dr. Schneider's opinion; rather, he afforded it "limited weight."  (R. 76.)  Moreover, the ALJ did in fact provide a reason for the weight attributed to the opinion: he determined that it was "based primarily on the claimant's subjective reports of his limitations rather than on observation or clinical evidence."  (*Id.*)  Plaintiff points to Dr. Schneider's

observations about underlying anger and irritability but otherwise cites Plaintiff's subjectively reported symptoms rather than objective evidence.  (Doc. 11 at 15.)  The ALJ provided a reason for discounting certain portions of Dr. Schneider's opinion and Plaintiff has not adequately refuted that reason.  We find no basis to find that the ALJ decision in this matter was error.

**3.** **Step Five**

Plaintiff asserts that the Commissioner failed to sustain her burden of establishing there is other work in the national economy Plaintiff could perform because the ALJ did not present all of Plaintiff's limitations in the hypothetical posed to the VE.  (Doc. 11 at 17.)  We conclude Plaintiff's claimed step five errors are not cause for remand.

Plaintiff points to the ALJ's finding that Plaintiff had moderate difficulties in maintaining concentration, persistence and pace and the ALJ's failure to specifically mention these limitations in his hypothetical.  (*Id.* at 18.)  Plaintiff acknowledges that the ALJ identified the following specific limitations in his RFC: "'can understand, remember and carry out simple instructions involving up to 3 step commands; limited to exercising only simple work-related judgments; limited to occupations involving only occasional changes to the routine work setting; limited to occasional interactions with members of hte public, coworkers and supervisors." (*Id.* (quoting R. 71-72).)

37

Plaintiff argues that, pursuant to *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2002), the limitations identified by the ALJ do not account for the concentration, persistence or pace limitations. (Doc. 11 at 18.)

As noted by Defendant, the ALJ's step two finding regarding concentration, persistence or pace is not a residual functional capacity assessment for steps four and five and the ALJ specifically notes this in his decision. (Doc. 12 at 21.) Defendant also distinguishes *Ramirez* on the basis that here the ALJ set out detailed work-related restrictions where *Ramirez* referred only to simple, unskilled work. (*Id.*) We agree that this distinction is significant. We are not persuaded otherwise by Plaintiff's reference in his reply brief to a previously cited Eastern District case where the court held that a limitation to "simple repetitive tasks" and "only occasional contact with the public and coworkers" did not adequately account for moderate difficulties in concentration, persistence or pace. (Doc. 15 at 4 (citing *Steinberger v. Barnhart*, Civ. A. No. 04-5383, 2005 WL 2077375, at *3-4 (E.D. Pa. Apr. 24, 2005)).) As set out above, the limitations provided by the ALJ here are more extensive. Furthermore, Plaintiff does not dispute the proposition for which Defendant cites *Holley v. Commissioner of Soc. Sec.*, 590 F. App'x 167 (3d Cir. 2014), or otherwise distinguish his case. (*See* Doc. 12 at 22 (citing *Holley* for the proposition that the case re-

38

emphasized "that when a claimant produces evidence that is generally very thin, an insistence that the ALJ, who demonstrated a 'sound knowledge of the record,' should have included a specific limitation for concentration, persistence or pace is 'not persuasive'").)  We find this to be the type of case identified in *Holley* based on our independent review of the record, including Plaintiff's attorney's own acknowledgment that "the medical records are somewhat sparse in this matter" (R. 15).

In his reply brief, Plaintiff also points to his testimony about carpal tunnel syndrome as it relates to the ALJ's step five determination.  (Doc. 15 at 5.)  The ALJ limited Plaintiff to occasional handling, fingering and feeling to account for Plaintiff's alleged difficulty.  (R. 72, 74-75.)  Plaintiff sets out the Dictionary of Occupational Titles ("DOT") # 524.687-022 list of functions for the conveyor line bakery worker position and asserts that it requires more use of the hands than he is capable of.  (Doc. 15 at 5.)

> "Performs any combination of following tasks in preparation of cakes along conveyer line: Reads production schedule or receives instructions regarding bakery products that require filling and icing. Inspects cakes moving along conveyer to detect defects and removes defective cakes from conveyer to reject bins.  Positions cakes on conveyer for application of filling or icing by machine, observes filling or icing application to ensure uniform coverage, and places additional cake layers, depending on number of cake layers in product.  Observes cakes moving under automatic shaker and cake

> cutting machine to ensure uniform topping
> application and cutting.  Smooths iced edges
> of cake, using spatula, and moves decorating
> tool over top of designated cakes to apply
> specified appearance.  Notifies supervisor of
> malfunctions."

(Doc. 11 at 22 (quoting DOT #524.687-022).)

This list of functions shows that a bakery line worker would not be required to "constantly use both hands" as Plaintiff claims.  (Doc. 15 at 6.)  The ALJ specifically asked the VE if there was any conflict between the information the VE provided and the DOT and the VE responded that there was not.  (R. 47.) Because the ALJ asked about whether there was a conflict (as required by *Burns v. Barnhart*, 312 F.3d 113, 127 (3d Cir. 2002)) and Plaintiff's counsel did not question consistency or otherwise object to the VE's identification of the bakery line worker position, we do not find that this claimed error is cause for remand.

## 4.   Plaintiff's Credibility

Finally, Plaintiff asserts that the ALJ's credibility finding is not based on substantial evidence.  (Doc. 11 at 20.)  Plaintiff points to five reasons the ALJ's determination is error.  We do not find error in any one of the identified bases.

First, Plaintiff faults the ALJ's reference to the conservative treatment of Plaintiff's psychiatric impairments. (Doc. 11 at 21 (citing R. 75).)  He argues that "an ALJ cannot override treating specialists who provide treatment consisting of

40

therapy and medication." (Doc. 11 at 21 (citing *Morales v. Apfel*, 225 F. 3d 310, 319 (2000)).) Plaintiff does not identify a treating specialist who was overridden by the ALJ. The records show that Plaintiff did not have a long term treating specialist for his psychiatric impairment (or in any other context). If he is referring to his treatment at Riverside Associates from January 14 through April 29, 2014, the licensed clinical social worker who was involved with Plaintiff, Hilary Spease, did not conclude that Plaintiff's mental health condition prevented him from working or otherwise conflict with the ALJ's findings. (*See* R. 316-319, 422-24.) As set out above, she suggested Plaintiff talk with his neurologist about his reported memory problems and either apply for disability or apply for a job depending on that assessment. (*See*, *e.g.*, R. 323.) Plaintiff's neurologist at the time was Jayant Acharya, M.D., and he found that Plaintiff's immediate recall as well as recent and remote memory were normal. (R. 344-45.) Therefore, even if we were to consider Ms. Spease Plaintiff's treating specialist for his mental impairments, the conflict to which Plaintiff may be referring is nonexistent.

Second, Plaintiff criticizes the ALJ's reference to the fact that Plaintiff did not start taking psychiatric medications until March 2014 on the basis that he could not afford the medications when they were prescribed in 2012. (Doc. 11 at 21.) Plaintiff does not expand upon this argument. It is just one of the many

41

reasons the ALJ found Plaintiff's testimony regarding his mental impairments not fully credible.  (R. 75-76.)  The ALJ carefully analyzed this issue and, although Plaintiff testified that he did not take medication because of cost, he does not explain his failure to seek any sort of treatment or attempt to procure medication in the almost two years between his discharge from Friends Hospital in February 2012 and the beginning of counseling at Riverside in January 2014.  Therefore, we conclude Plaintiff has not shown merit in his second basis for asserting the ALJ's credibility determination is error.

Third, Plaintiff points to the ALJ's notation regarding his testimony that his medications cause lethargy and tiredness. (Doc. 11 at 21 (citing R. 73).)  He states that the ALJ failed to incorporate this in his RFC assessment.  (Doc. 11 at 21.) Plaintiff does not expand this argument.  (*Id.*)  We need not discuss it further on this basis.  However, we also note that *Holley's* guidance regarding thin evidence and RFC limitations discussed above may apply in this context as well.  590 F. App'x 167.

Plaintiff's fourth cited credibility error relates to his testimony about his carpal tunnel syndrome and the bakery line job.  We addressed this claimed error above.  (Doc. 11 at 21.)

Fifth, Plaintiff asserts it was error for the ALJ not to take note that GAF ratings continue to be opinion evidence that should

42

be considered pursuant to Social Security Administrative Message 13066.  (Doc. 11 at 23.)  Plaintiff cites no authority for the proposition that an ALJ must take note of the changing relevance of GAF scores.  More importantly, the ALJ stated why he afforded GAF scores very little weight, including the fact that some scores reflect Plaintiff's functioning prior to his onset date and during periods of exacerbation.  (R. 76-77.)  We find no error in this assessment.

In sum, the ALJ's credibility determination is not error for any of the specific reasons advanced by Plaintiff.  The ALJ carefully reviewed the evidence of record and identified the reasons for his findings.  (R. 72-77.)

## V. Conclusion

For the reasons discussed above, we find no basis for remand in the errors claimed by Plaintiff.  Therefore, Plaintiff's appeal of the Acting Commissioner's denial of benefits (Doc. 1) is denied.  An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: July 27, 2015

43